## Shuman, Appellant, *v*. Bernie's Drug Concessions.

540

Argued November 15, 1962. Before BELL, C. J., MUSMANNO, JONES, COHEN, EAGEN, O'BRIEN and KEIM, JJ.

*S. Walter Foulkrod, Jr.*, for appellants.

*William T. Coleman, Jr.*, with him *Harold E. Kohn, Aaron M. Fine, Bruce W. Kauffman, Leonard M. Sagot*, and *Dilworth, Paxson, Kalish, Kohn & Dilks*, for appellee.

*Milton W. Lamproplos, I. Leonard Greenwald,* and *Eckert, Seamans & Cherin,* for interested persons.

OPINION BY MR. JUSTICE COHEN, January 21, 1963:

Appellants, five retail drug store owners, filed a complaint in equity against appellee, Bernie's Cut Rate Store, praying for an injunction to restrain appellee from selling drug and cosmetic products below the minimum retail prices established by manufacturers in accordance with the provisions of the Pennsylvania Fair Trade Act, as amended.[1]

All the merchants involved in this controversy do business in the same competitive trade area. When appellee opened his cut rate store and began underselling appellants, the latter decided to take some corrective action. After mutual consultation,[2] appellants agreed to solicit fair trade contracts with the hope of thereby causing the manufacturers to enforce minimum resale prices. Pursuant to this agreement, each drug store owner solicited and entered into separate fair trade contracts with five previously selected manufacturers. All of these contracts were obtained at or about the same time. Shortly thereafter, appellants notified the manufacturers of appellee's violations. When it became obvious that no effort was being made by the manufacturers to enforce fair trade, appellants joined in bringing this suit.

One of the findings of fact of the court below, which is amply supported by the record, is that the purpose of appellants' concerted action was to protect their businesses from appellee's discount sales by maintaining the price level on the product line of the five manufacturers. The lower court also emphasized that no

---

[1] Act of June 5, 1935, P. L. 266, §2; Act of June 12, 1941, P. L. 128, No. 66, §1; Act of May 25, 1956, P. L. 1756, §1, 73 P.S. §8.

[2] Some appellants met personally while others were contacted by telephone.

evidence was introduced to establish that the purpose of the concerted action was to protect the good will of the manufacturers or to protect the public against predatory practices.

Because of the inherently pernicious nature of price-fixing agreements, they have been declared invalid both at common law[3] and illegal per se under the federal antitrust laws. *Gulf Oil Corporation v. Mays*, 401 Pa. 413, 164 A. 2d 656 (1960) ; *Schwegmann Brothers v. Calvert Distillers Corporation*, 341 U.S. 384 (1951) ; *Dr. Miles Medical Company v. John D. Park & Sons Company*, 220 U.S. 373 (1911). As Mr. Chief Justice WARREN stated in *United States v. McKesson & Robbins, Inc.*, 351 U.S. 305, 309-10 (1956) : "It has been held too often to require elaboration now that price fixing is contrary to the policy of competition underlying the Sherman Act and that its illegality does not depend on a showing of its unreasonableness, since it is conclusively presumed to be unreasonable. It makes no difference whether the motives of the participants are good or evil; whether the price fixing is accomplished by express contract or by some more subtle means; whether the participants possess market control; whether the amount of interstate commerce affected is large or small; or whether the effect of the agreement is to raise or to decrease prices."

However, as a matter of legislative policy Congress has seen fit to enact the Miller-Tydings and McGuire Amendments to the antitrust laws which insulate, upon compliance with certain conditions, resale price maintenance contracts from illegality under the Sherman Antitrust and Federal Trade Commission Acts.[4]

---

[3] *Ford Motor Co. v. Quinn*, 70 Pa. Superior Ct. 337 (1918).

[4] The products which are the subject of appellants' agreement are shipped in interstate commerce. Appellants do not contend that the agreement in question was outside the ambit of interstate commerce.

But since price fixing has been considered an anathema because of its strangling effect upon competition, it is essential that all price-fixing agreements strictly comply with the provisions of this federal exempting legislation and the applicable provisions of the Pennsylvania Fair Trade Act, as amended. *Gulf Oil v. Mays,* supra.

Under the Miller-Tydings[5] and McGuire Amendments,[6] and section 3 of the Pennsylvania Fair Trade Act,[7] agreements between competitors at the same horizontal level of distribution are not given the sanction of legality accorded vertical fair trade agreements. In substantially the same language, all three acts make clear that the exemption of certain resale price maintenance contracts from the prohibitions of the antitrust laws "shall not make lawful any contract or agreement, providing for the establishment or maintenance of minimum resale prices on any commodity herein involved, between manufacturers, or between producers, or between wholesalers, or between brokers, or between factors, *or between retailers, or between persons, firms, or corporations in competition with each other.*" Miller-Tydings Amendment, 50 Stat. 693 (1937), 15 U.S.C. §1. (Emphasis supplied.)

Since horizontal agreements to fix prices are not protected by the exempting legislation, we must apply the traditional per se doctrine to the facts of the instant case.[8] The findings of fact of the court below leave no doubt that the motivating purpose of appel-

---

[5] 50 Stat. 693 (1937), 15 U.S.C. §1.

[6] 66 Stat. 632 (1952), 15 U.S.C. §45(a)(5) (Supp. 1961).

[7] Act of June 5, 1935, P. L. 266, §3, as amended by Act of May 22, 1941, P. L. 49, No. 30, §1, 73 P.S. §9.

[8] In *United States v. McKesson & Robbins, Inc.*, 351 U. S. 305, 309-10 (1956), the Court stated that the Miller-Tydings and McGuire Amendments were not intended by Congress to change the doctrine that price fixing is illegal per se.

lants' concerted action was to fix prices in order to prevent their competitive position from being impaired; the purpose was not to protect the good will of the manufacturers nor to protect the public against predatory loss-leader practices. Under these circumstances, their conduct constitutes an unprotected price-fixing conspiracy in restraint of trade, illegal per se under section 1 of the Sherman Antitrust Act and unlawful at common law.[9] Since the vertical fair trade agreements are the incidents or fruits of an unlawful conspiracy, they are infected with the illegality of the horizontal conspiracy and are hence unenforceable. See *United States v. Bausch & Lomb Optical Company,* 321 U.S. 707, 724 (1944); *Pazen v. Silver Rod Stores, Inc.,* 130 N.J. Eq. 407, 412, 22 A. 2d 237, 240 (1941).

Appellants contend that since the object of their joint action, i.e., obtaining fair trade contracts, is perfectly legal when conducted individually, this conduct should not be treated differently when done in concert. This argument does not take into account a familiar principle of antitrust law that what may be lawful when practiced individually can be unlawful when performed pursuant to a combination or concert of action. See *American Tobacco Company v. United States,* 328 U.S. 781, 809 (1946); *Bedford Cut Stone Co. v. Journeyman Stone Cutters' Association of North America,* 274 U.S. 37, 54 (1927).

Appellants also claim that its conduct is analogous to the joint action involved in the bringing of a class suit by parties injured in the same motor vehicle accident. This analogy is fallacious because appellants did not join together after the cause of action had already arisen for the purpose of pursuing more con-

---

[9] See *Rayess v. Lane Drug Co.,* 138 Ohio St. 401, 35 N.E. 2d 447 (1941); *Pazen v. Silver Rod Stores, Inc.,* 130 N.J. Eq. 407, 22 A. 2d 237 (1941).

veniently their legal remedies. Instead, they acted in concert prior to any infringement of their legal rights.[10]

As an alternative ground to support the judgment of the court below, appellee argues that appellants do not have standing to bring this action since they are not suing derivatively to protect the good will of the manufacturer,[11] and because there is no proprietary interest in the good will of the products residing in themselves. Contrary to this contention, appellants maintain that the language of the 1941 Amendment to the Pennsylvania Fair Trade Act specifically grants them standing.[12] Because of our disposition of this controversy on the illegal conspiracy ground, we need not express an opinion on this question.

On a broader plain, counsel for appellee also draws into question the ultimate constitutional validity of the nonsigner provision. In accordance with the familiar principle that a court will not decide a constitutional question unless it is absolutely required to do so, we refrain from considering the problem at this time. *Robinson Township School District v. Houghton,* 387 Pa. 236, 128 A. 2d 58 (1956) ; *Altieri v. Allentown Retirement Board,* 368 Pa. 176, 180, 81 A. 2d 884, 886 (1951). However, we cannot fail to observe in-

[10] There is some evidence in the record that an attorney was contacted before the contracts were obtained.

[11] The premise of this argument is that the sole purpose of fair trade legislation was to protect the property interest of the manufacturer in the good will of his product from being injured by loss-leader selling and predatory price cutting. Along these lines, it is also contended that the manufacturer's policy of nonenforcement precludes the retailers from bringing this suit.

[12] The Act provides that violations are "actionable at the suit of such vendor, buyer or purchaser of such commodity." Act of June 12, 1941, P. L. 128, No. 66, §1, 73 P.S. §8. Appellants contend that one of the purposes of the 1941 amendment was to give retailers a cause of action separate and apart from any rights given to the manufacturers.

creasing objèctions to the legality of nonsigner provisions in particular[13] and to the economic soundness of fair trade laws in general. E.g., Schachtman, Resale Price Maintenance and the Fair Trade Laws, 11 U. Pitt. L. Rev. 562, 590 (1950); Herman, A Note on. Fair Trade, 65 Yale L.J. 23 (1955). Changing patterns of merchandising and distribution require a reappraisal of the underlying premises of fair trade legislation.

Decree affirmed at appellants' cost.

[13] By 1960, the highest courts of eighteen states have held nonsigner clauses to violate their state constitutions. Conant, Resale Price Maintenance: Constitutionality of Nonsigner Clauses, 109 U. Pa. L. Rev. 539, 541 (1961).